AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No.  25-SC-1042 |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT | ) |
| STORED AT PREMISES CONTROLLED BY ONE | ) |
| PROVIDER PURSUANT TO 18 U.S.C. 2703 FOR | ) |
| INVESTIGATION OF VIOLATION OF 18 U.S.C. 2252(a)(2) | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> See Attachment A (incorporated by reference)

Located within the jurisdiction of the District of Columbia, there is now concealed  *(identify the person or describe the property to be seized)*:

> See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2252(a)(2) (Distribution of Child Pornography). | |

The application is based on these facts:

> See Affidavit in Support of Application for Search Warrant.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Kathleen Callaway, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means).*

Date:  _____6/24/2025_____

_____
*Judge's signature*

City and state:  _____Washington, D.C._____

Zia M. Faruqui
(United States Magistrate Judge)

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means            ☑ Original            ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No.  25-SC-1042 |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT | ) |
| STORED AT PREMISES CONTROLLED BY ONE | ) |
| PROVIDER PURSUANT TO 18 U.S.C. 2703 FOR | ) |
| INVESTIGATION OF VIOLATION OF 18 U.S.C. 2252(a)(2) | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:       Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia.
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ July 08, 2025 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Zia M. Faruqui _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:  _____ 6/24/2025 _____            _____
                                                                                                                    *Judge's signature*

City and state:  _____ Washington, D.C. _____            **Zia M. Faruqui**
                                                                                         United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br><br>25-SC-1042 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## **ATTACHMENT A**

*Property to Be Searched*

This warrant applies to information associated with the GRINDR account user associated with username "Fart on me", user ID: 587899706, and/or email address zach.brandner@dexian.com (SUBJECT GRINDR ACCOUNT), which is stored at the premises controlled by Grindr LLC., a company headquartered at 9450 SW Gemini Dr, PMB 73938 Beaverton, OR 97008.

## **ATTACHMENT B**

*Particular Things to be Seized*

### I.      **Information to be disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of Grindr LLC., regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or information that have been deleted but are still available to Grindr LLC., or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Grindr LLC. is required to disclose the following information to the government for each account or identifier listed in Attachment A:

1.      For the time period from account creation through to the present: The contents of all communications and related transactional records for all PROVIDER services used by an Account subscriber/user (such as file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services), including but not limited to incoming, outgoing, and draft messages, calls, chats, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication (including originating IP addresses of emails); the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies);

2.      For the time period from account creation through to the present: The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as email services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services), including any information generated, modified, or stored

by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

3.      All records regarding identification of the Account, including names, addresses, telephone numbers, alternative email addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

4.      All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s);

5.      Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common email address (such as a common recovery email address), or a common telephone number, means of payment (*e.g.*, credit card number),

registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

6.      For the time period between account creation and the present day: All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

7.      For the time period from account creation to the present day: All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

8.      Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).


Within five days of the issuance of this warrant, PROVIDER shall deliver the information set forth above to the following:

Special Agent Kathleen Callaway
Kcallaway@fbi.gov


PROVIDER is specifically authorized to transmit or send the information specified below to the Federal Bureau of Investigation anywhere in the United States, including, but not limited to, Washington, D.C.

**II.     Information to be seized by the Government**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. 2252(a)(2), Distribution of Child Pornography, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

1.  Communications involving the distribution, possession, receipt, and/or transportation of child pornography;

2.  Communications related to the sexual exploitation of minors;

3.  The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

4.  The identity of the person(s) who communicated with the user ID about matters relating to the sexual exploitation of children, including records that help reveal the whereabouts.

5.  Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

**III.     Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMIBA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY ONE PROVIDER PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 2252(a)(2) | Case No. <u>25-SC-1042</u><br><br>**<u>Filed Under Seal</u>** |

*Reference:      USAO Ref. # 2025R00644; Subject Account(s): Fart on Me, User ID #587899706*

## AFFIDAVIT IN SUPPORT OF<br>AN APPLICATION FOR A SEARCH WARRANT

I, Kathleen Callaway, being first duly sworn, state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with one account – that is the account with display name Fart on Me and User ID 587899706 – which is stored at premises controlled by Grindr LLC., an electronic communications services provider and/or remote computing service provider headquartered at Telos Legal Corp., 9450 SW Gemini Dr., PMB 73938, Beaverton, OR 97008. The information to be searched is described in the following paragraphs and in Attachment A. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons

will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation (FBI). I have been in this position since May 2019. I am currently assigned to the FBI Washington Field Office's Child Exploitation and Human Trafficking Task Force, in which I investigate crimes involving the sexual exploitation of children, including but not limited to child sexual abuse material and human trafficking. As a Special Agent with the FBI, I received training on investigative techniques related to crimes involving the sexual exploitation of children, including obtaining and analyzing digital records, analyzing stored digital media, undercover activities, and the application for and execution of search and arrest warrants. I have conducted and assisted in federal child exploitation investigations and participated in the execution of numerous search warrants in support of child exploitation investigations. Through my training and experience, as well as through conversations with various law enforcement personnel and computer forensic examiners, I have become familiar with the methods of operation used by people who commit offenses involving the sexual exploitation of children. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

3.   The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.   Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. 2252(a)(2), Distribution of Child Pornography have been committed by ZACHARY BRANDNER. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. § 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court of the District of Columbia is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND ON GRINDR

6.     The Grindr application is owned by Grindr LLC. Grindr is a social networking application designed for gay, bi, trans, and queer people and provides an online platform for users to send messages and share pictures. It also shows locations of the persons involved in the conversations. The privacy policy of the Grindr application states that the company collections account credentials, device information, personal information, precise location and distance information, log files, chat messages, profile information, and/or purchase information.

7.     In general, providers like Grindr LLC. ask each of their subscribers to provide certain personal identifying information when registering for an account. This information can include the subscriber's full name, physical address, telephone numbers, images, and other identifiers, e-mail addresses, and, for paying subscribers, a means and source of payment (including any credit or bank account number).

8.    Providers like Grindr LLC. typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account. In addition, providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

9.    In some cases, account users will communicate directly with a provider about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

10.    Information stored in connection with an account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with an Application A account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such

as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the provider can show how and when the account was accessed or used. For example, providers such as Grindr LLC. typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the account may indicate its user's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

11.     The Grindr application ("app") is available for download via the App Store for most iOS devices such as iPhones and iPads. Additionally, the Grindr app is available on the Google PlayStore for Android devices and Microsoft Store for Windows devices. Grindr can be used on multiple mobile devices, to include cellular phones and tablets.  Grindr comes in a free and subscription paid version (Grindr Xtra).

## **PROBABLE CAUSE**

12.     On April 1, 2025, a Federal Bureau of Investigation (FBI) Task Force Officer (TFO) assigned to the Washington Field Office (WFO) was acting in an online undercover (UC)

capacity as part of the FBI Child Exploitation and Human Trafficking Task Force (CEHTTF), operating out of a satellite office in Washington, D.C.

13.     In that capacity, the UC was monitoring the dating application, Jack'd.  The UC maintains a profile on the dating application that indicates that the UC is interested in the sexual exploitation of children using child exploitation key words prominently listed in the UC's Jack'd profile page.  The UC maintains that they are a father to a purported nine-year-old son.

14.     On April 1, 2025, the UC was contacted by the Jack'd user "fart fetish 👆🐽."  The user's profile indicated that they were approximately a mile away from the UC, that they are 6'5", and that they lived in "SW."  The user had the following conversation with the UC via Jack'd direct message:

> fart fetish 👆🐽:  Into kids?
> Undercover:  I can be.  They're adorable (fart fetish 👆🐽 reacted to this message with a purple devil emoji).

> fart fetish 👆🐽:  Same dude.  Little boy cock.  So cute.  Bet ur kids are cute 😊  I have Tele if ur down to chat more!

> Undercover:  Hell yah.  What's your tele?

> fart fetish 👆🐽:  zboi29

15.     On April 1, 2025, at approximately 11:12 AM, the UC messaged zboi29 via Telegram. The user had a display name of Z.  Zboi29 advised the UC that he was interested in "…infants up to 12" and asked the UC if he had kids.  The UC advised that he has a son that is nine and he is sexually active with him.  Zboi29 asked the UC, "Done anything w him" and the UC advised, "I have…..got anything pervy so I know you're cool.  Don't care what it is."

16.     Zboi29 forwarded a video file that is five minutes and thirty-six seconds long that showed an infant boy being undressed and then restrained on his back with a piece of cloth to a small piece of furniture by an adult male.  The adult male is observed from the waist down with

his penis exposed squatting over the boy and defecating on the child's chest and then urinating in the child's mouth.  The child's restraints are removed and then restrained stomach down on the piece of furniture with a cloth.  The adult male slaps the child's buttocks and inserts his fingers into the child's anus.  The adult male then ejaculates onto the child's buttocks.  Zboi29 then forwarded a second video that is fifty-seven seconds long and shows a prepubescent boy having his mouth penetrated by the erect penis of an adult male.

17.    Zboi29 reported after sending the second, "I'm sorry i don't have much" and then stated after sending the second video, "But I'm super child bro."  Zboi29 commented on the infant's video, "Hell yea.  Rape it.  U have some i could see?  Or maybe ur son."  The UC forwarded a photograph of his purported son and a photograph of his purported penis and asked Zboi29 if he had any experience.[1]  Zboi29 reported "Yes some" and advised "Hottttt" regarding the photos sent by the UC.  The UC advised how he sexually abuses his purported son and Zboi29 asked, "Fuck yeah.  Fr?  And he enjoys it?  How do u keep him quiet?  Just curious."  The UC advised Zboi29 how he has kept his purported son quiet regarding the abuse.

18.    The UC found that Zboi29 had blocked the UC on Telegram and Jack'd shortly after UC discussed how he keeps his purported son from disclosing abuse.

19.    On April 1, 2025, an administrative subpoena was issued to Perry Street Software, the parent company of Jack'd, by a member of the FBI.  The FBI requested subscriber information and internet protocol (IP) logs for the identified account.

20.    On April 30, 2025, Perry Street Software responded to the administrative subpoena and indicated that the account had been accessed on April 28, 2025, from an IP address of 70.21.16.223.  70.21.16.223 generally resolves to a Verizon Fios subscriber in Washington, D.C.

---

[1] The photograph of the UC's purported son did not depict a real child. The photograph of a purported penis did not depict a real penis.

21.     Perry Street Software also provided latitude and longitude for the account being accessed at 38.880108284786, -77.011122575394 which when plotted resolves to an apartment building at 64 H Street Southwest.  The account user provided biographical information for the account which included information indicating they lived in SW (indicating Southwest Washington, D.C.), are "Hispanic / Latino," and a date of birth of 11-30-1997.

22.     Perry Street Software also provided images used by the user as profile pictures. These photographs were analyzed by a member of the FBI CEHTTF using law enforcement sensitive facial recognition tool.  The members subsequently identified a possible match to the profile pictures of Zachary Silas Brandner with a date of birth of 07-05-1997 and a current address of 64 H Street Southwest #849, Washington, D.C. via a law enforcement only database.

23.     A member of the FBI CEHTTF requested that a member of the United States Postal Service (USPS) check for deliveries to 64 H Street, #849, Southwest, Washington, D.C.  The member of the USPS reported that Brandner had received a package at 64 H Street #849, Southwest, Washington, D.C. on September 3, 2024.

24.     A photograph used by the Jack'd user is attached below along with a driver's license photograph of Zachary Brander.



25.    On May 9, 2025, Magistrate Judge G. Michael Harvey signed a search warrant for the contents of the Jack'd account associated with fart fetish 👃 💩.

26.    Your affiant reviewed the contents of the identified Jack'd account and located the following messages sent:

"I'm on my way to my brunch now. I really am sorry dawg. I don't know wtf happened. But I'll make it up to u. My building 64 H St Sw room 848. In telling u that so soon as im back next time ur free u can just show up." – January 26, 2025

What do i do for work? I was an IT account manager but i gave it up a week ago to be a congressional staffer" – January 23, 2025

"Into watching young boys poop on eachother?  I got Telegram if so.  Yea but u chill with twisted ages like Yng?  Got super sloppy vids…Anyone who don't like little boys being pooped on is lying lol…Yep and some with dads pooping in the boys…I mean I'll show i haha.  Just gotta be cool with watching kids.  I'm chill just wanted to make sure u were haha….Back when i was a student at Pitt i think

we talked but i was just discovering my shit fetish then." – January 26, 2025 at 4:33

UTC

27.    The member of the FBI also identified the following three Meta LLC accounts

linked to Brandner:

https://www.instagram.com/zachbrandner/

https://www.facebook.com/zach.brandner.96/

https://www.facebook.com/zach.brandner

28.    On May 5, 2025, an administrative subpoena was issued to Meta LLC. by a member

of the FBI.  The FBI requested subscriber information and internet protocol (IP) logs for the

identified Meta accounts.

29.    On May 15, 2025, Meta LLC. Provided the requested information regarding the

three identified Meta LLC. accounts.  Meta LLC. Provided the following information for the

accounts:


https://www.instagram.com/zachbrandner/

Zach Brandner (First / Last Name)
ZSBrand@pointpark.edu
412-863-8215 - Verified on 4-18-2023

https://www.facebook.com/zach.brandner.96/
Zach Brandner (First / Last Name)
412-863-8215 (Verified)

https://www.facebook.com/zach.brandner
Zach Brandner (First / Last Name)
brandnerz48@gmail.com (Verified Primary)
Zac.brandner@facebook.com (Verified)
Zacharybrandner@yahoo.com (Unverified)
10-06-2011 (Registration Date)
412-863-8215 (Verified)
724-433-1335 (Verified)
Visa 443040-XX-XXXX-7032

30.     On May 21, 2025, an administrative subpoena was issued to Verizon Wireless by a member of the FBI.  The FBI requested subscriber information for the telephone number of 412-863-8215, which was associated with Brandner's Meta accounts.

31.     On May 22, 2025, Verizon Wireless provided the requested subscriber information and indicated that the account is registered to Zach Brandner with a billing address of 9335 E Parkhill Drive, Bethesda, Maryland.  The account has been active since February 16, 2021.

32.     On May 20, 2025, the Jack'd user fart fetish 👌 👅 messaged the UC via Jack'd direct message and asked "Real dad."  On May 22, 2025, the UC responded to fart fetish 👌 👅 who did not indicate remembering messaging the UC previously at this point, but did indicate in the chat that he had a sexual interest in children.  fart fetish 👌 👅 advised the UC that he, "Wish it was normalized man," "I think most men are into it," "…Idk I'm just very turned on by Yng," "And the younger the better."  fart fetish 👌 👅 indicated an interest in gaining experience with a child and provided the Telegram account of Zboi29 to communicate with the UC further.

33.     On May 21, 2025, at 11:43 am, the UC messaged Zboi29 via Telegram direct message.  The UC advised Zboi29 that they had spoken in the past and asked why he had blocked the UC. Zboi29 reported that he had "gotten scared in the past.  But not anymore."

34.     The UC again advised Zboi29 that he is a father to a nine-year-old purported son and Zboi29 advised, "Nice dude great age."  Zboi29 also reported, "I feel like 12 is the cut off for me."   Zboi29 asked the UC how he sexually abuses the purported child and how he keeps the purported child from disclosing.  Zboi29 also indicated an interest in meeting the UC to build up trust and then meet the UC's purported son.  Zboi29 advised the UC, "We could meet and perf the first time.  Perv" and indicated, "Can't wait to see him."  The UC asked, "What do you want to see" and Zboi29 reported, "Anything tbh.  His little cock."

35.     Your affiant conducted a records search of commercial, open source, and law enforcement databases for information related to Brandner.  Your affiant found that the email address of Zach.Brandner@Dexian.com had been associated with him previously and a public LinkedIn page indicated Brandner worked for Dexian.  Your affiant also found that the public LinkedIn page indicated Brandner had attended Point Park University and previously attended University of Pittsburgh. This is consistent with the above-referenced messages from Jack'd which discussed being a student at "Pitt."

36.     A records search of a NCMEC database found that an employee of Grindr had reported an allegation on February 13, 2024. The employee advised that the Grindr user, Fart on Me (User ID #587899706), had been reported by other users for asking for "sensitive pictures/videos of minors." Grindr advised the user had registered the account with an email address of Zach.Brandner@dexian.com. Based on Brandner's prior employment at Dexian, this appears to be the same individual.

37.     Your affiant knows from familiarity with other investigations and users of the Grindr app, who receive and distribute child pornography, that users who engage in this behavior do so for the longevity of their use of the app. Additionally, those who sexually exploit children online frequently converse with other like-minded individuals who receive and distribute child pornography; rarely destroy the conversations and images/videos they receive and/or possess. However, if they do, the content still may still exist with the location of the application or on the device used by the subscriber to the account. The requested order seeks records from account inception to the present.  Records covering the period when the listed accounts were established and immediately thereafter will allow law enforcement to confirm or deny the identity and location of the account user(s) (i.e., evidence of user attribution), and to connect the account and its user(s)

to offense conduct that is the subject of this investigation.  Records covering the time period of account inception to present will also provide information about the account user's long-term patterns of communication and relationships with other persons, including potential co-conspirators (namely, other individuals engaged in sharing, trading, and/or buying/selling child pornography). As a result, the warrant seeks records from the Grindr account's inception to present.

38.    Therefore, your affiant has probable cause to believe there is evidence of distribution, possession, receipt, and/or transportation of child pornography throughout the existence of the SUBJECT GRINDR ACCOUNT.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO TRANSPORT, DISTRIBUTE, POSSESS, AND/OR ACCESS WITH INTENT TO VIEW CHILD PORNOGRAPHY

39.    Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who transport, distribute, possess, and/or access with intent to view child pornography:

a.    Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b.    Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children

they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.      Such individuals almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d.      Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.  These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the child pornography images, which are valued highly.  Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis; however, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools.

e.      Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual

"deleted" it.[2]

  f. Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

40. Based on the information above, your Affiant believes that the user of the SUBJECT JACK'D ACCOUNT likely displays characteristics common to individuals who transport, distribute, possess, or access with intent to view child pornography.

## **DEFINITIONS**

41. Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

  a. IP Address:  The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service

---

[2] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010).)

providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b. The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c. "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any adversary that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

d. "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

e. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

f.  "Child Pornography" means the definition in 18 U.S.C. § 2256(8) (any visual

depiction of sexually explicit conduct where (a) the production of the visual

depiction involved the use of a minor engaged in sexually explicit conduct, (b) the

visual depiction is a digital image, computer image, or computer-generated image

that is, or is indistinguishable from, that of a minor engaged in sexually explicit

conduct, or (c) the visual depiction has been created, adapted, or modified to

appear that an identifiable minor is engaged in sexually explicit conduct), as well

as any visual depiction, the production of which involves the use of a minor

engaged in sexually explicit conduct.  *See* 18 U.S.C. §§ 2252 and 2256(2)(8).

g.  "Computer" means "an electronic, magnetic, optical, electrochemical, or other

high speed data processing device performing logical or storage functions, and

includes any data storage facility or communications facility directly related to or

operating in conjunction with such device."  *See* 18 U.S.C. § 1030(e)(1).

h.  "Computer hardware" means all equipment that can receive, capture, collect,

analyze, create, display, convert, store, conceal, or transmit electronic, magnetic,

or similar computer impulses or data.  Computer hardware includes any data-

processing devices (including, but not limited to, central processing units, internal

and peripheral storage devices such as fixed disks, external hard drives, floppy

disk drives and diskettes, and other memory storage devices); peripheral

input/output devices (including, but not limited to, keyboards, printers, video

display monitors, modems, routers, scanners and related communications devices

such as cables and connections), as well as any devices, mechanisms, or parts that

can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

i. "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

j. "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

k. "Computer-related documentation" means written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

l. "Domain Name" means the common, easy-to-remember names associated with an Internet Protocol address. For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32. Domain names are

typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.  "Internet Connection" means a connection required for access to the Internet. The connection would be provided by cable, DSL (Digital Subscriber Line) or satellite systems.

n.  "Internet Service Providers" or "ISPs" mean commercial organizations which provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer various means by which to access the Internet including telephone based dial-up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber

an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and password.

o. "Minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

p. A "modem" translates signals for physical transmission to and from the Internet Service Provider, which then sends and receives the information to and from other computers connected to the Internet.

q. A "router" often serves as a wireless access point and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. The router is in turn typically connected to a modem.

r. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. *See* 18 U.S.C. § 2256(2).

s.  "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.  See 18 U.S.C. § 2256(5).

t.  "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

u.  "Wireless network" as used herein means a system of wireless communications in which signals are sent and received via electromagnetic waves such as radio waves.  Each person wanting to connect to a wireless network needs a computer which has a wireless network card that operates on the same frequency.  Many wired networks base the security of the network on physical access control, trusting all the users on the local network.  But, if wireless access points are connected to the network, anyone in proximity to the network can connect to it. A wireless access point is equipment that connects to the modem and broadcasts a signal.  It is possible for an unknown user who has a computer with a wireless access card to access an unencrypted wireless network.  Once connected to that network, the user can access any resources available on that network to include other computers or shared Internet connections.

v.  "Secure Hash Algorithm Version 1 hash value" (SHA 1 hash value) is an algorithm that processes digital files, resulting in a 160-bit value that is unique to that file.  It is computationally infeasible for two files with different content to have the same SHA 1 hash value.  By comparing the hash values of files, it can be

concluded that two files that share the same hash value are identical with a precision that exceeds 99.9999 percent certainty.  There is no known instance of two different child pornographic images or videos having the same SHA1 hash value.

w.  "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet.  In general, P2P software allows a user to set up files on a computer to be shared with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network.  However, a tool used by law enforcement restricts the download so that the file is downloaded, in whole or in part, from a single user on the network.

x.  When a user wishes to share a file, the user adds the file to a shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's SHA 1 has value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

y.  Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

## **CONCLUSION**

42.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

_____
Kathleen Callaway
Special Agent
Federal Bureau of Investigation


Sworn and Attested to me by Applicant by Telephone per Fed. R. Crim. P. 4.1 and 41 (d)(3) and on June 24, 2025.


_____
HONORABLE ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER. The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.	all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.	such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.	the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.	the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____        _____
Date                                                      Signature